In the Matter of the Estate of ANNA RICHARDS McGRATH, Deceased.

Surrogate's Court, New York County, May 17, 1930.

*Francis Sim McGrath*, for the Pennsylvania Company for Insurance of Lives and Granting Annuities, executor.

*Cadwalader, Wickersham & Taft*, for the trustee.

*McKercher & Link* [*George Link, Jr.*, of counsel], for Elizabeth Ravelly, petitioner.

*Bela Darwin Eisler*, for Indigent Widows Society.

O'BRIEN, S. *Decedent died November 13, 1929. The second codicil to her will was executed November 9, 1929.* This codicil is the subject of controversy in this non-jury will contest. The subscribing witnesses were Venita Pendleton, who had known decedent for ten months, and Bess L. Stevens, who knew decedent casually. The propounded paper is holographic. The decedent was about eighty-six to eighty-eight years of age at the time of its execution. The testimony of Miss Pendleton disclosed the fact that November seventh, two days previous to the execution of the paper, testatrix had asked her to tell her sister-in-law, Mrs. Cady, to give Miss Ravelly $2,000. On this point her testimony in part was as follows: " She said that she had written to me and she wanted

me to give the letter to Mrs. Cady (*sister-in-law of testatrix*) and she asked her — asked me to see that Miss Ravelly got the $2,000 and I asked her —  Q. Just a moment. Is that the letter and envelope she gave you at that time.  A. Yes." The envelope was sealed. The paper within the envelope bore in the handwriting of testatrix the following inscription:

" The Penna. Co., Nov. 6th, 1929.  Please give to Miss Ravelly at my death two thousand dollars as a present from me for devotion in my last few hours.

" A. R. McGRATH.

" My grand father clock I giv to Virginia Pfeil."

Miss Pendleton testified further as follows: " The witness: I was disturbed about it, and I called up Mr. Link and asked him what I ought to do about it, and he told me it would not be legal unless it was signed in the presence of two witnesses, who signed it. I said I had no interest in the matter, and what was I to do.  Mr. Link said that my duty was to the lady, my friend.  I went to see her again, and she signed it, and I signed.  Q. What happened when she signed this document, Proponent's Exhibit No. 1?  A. She was sitting up in bed and the nurse was in the apartment.  Miss Stevens and I were there, and she signed it in our presence, and then we signed it.  Q. What did she say at the time she signed it?  A. She said that she wanted to add something to her will, and that she wanted to provide for Miss Ravelly, and she asked us to sign it. Q. As witnesses?  A. As witnesses, and she thanked us for it and said she was glad to have it done.  Q. And who was present at that time?  A. Mrs. McGrath and Miss Stevens and I.  Q. And you saw Mrs. McGrath sign this document?  A. I saw her sign it, yes.  Q. Did you see Miss Stevens sign it?  A. Yes, I did.  Q. And you were all together there?  A. Yes, sir.  Q. At the time that the document was signed was Mrs. McGrath rational?  A. Yes, she was.  By the surrogate: Q. Was she under any restraint or undue influence at the time.  A. No.  *  *  *  Q. When did this take place?  A. That was before the signature.  I certainly saw her once besides the time — there was the time of the signature, and before that the time that she asked me to see —  I said, ' What can I do for you? ' and she said, ' See that Miss Ravelly ' — she said that she was worried about Miss Ravelly and she wanted her to have this money and to tell Sally, Mrs. Cady, she said, ' Tell Sally to give Miss Ravelly $2000.'  And once before that I saw her at least, and that was when she said what I told you.  By the surrogate: Q. Are you related to Miss Ravelly?  A. No, I know her very slightly.  Q. Are you a beneficiary under the will or under

any codicil of a will? A. Absolutely not. Q. Are you acquainted with anybody that is interested? A. No, sir. Q. In the will or codicil? A. Not a bit. The witness: You asked whether I had anything to do with it. I didn't know Miss Ravelly. I knew her slightly. I had no interest in any of the beneficiaries. Mrs. McGrath told me many times that she was worried about Miss Ravelly and she wanted to do something for her, but that her sister would not like it if she did, and in the fall, when she came back from her vacation she talked about Miss Ravelly a great deal. Miss Ravelly is a very nervous person and not very attractive, and she was very much worried about her, and one of Mrs. McGrath's great interests was in providing for women in their old age, and she talked about it a great deal, and I knew that she wanted to provide for Miss Ravelly, but that she was doubtful about it and a little worried about it, so that I understood very well when she spoke about that she wanted me to see that she got the $2000. By the surrogate: Q. Two days before the incident wherein she signed the paper and you signed and the other lady, she had spoken to you about Miss Ravelly? A. Yes, sir. Q. Did she give you a writing at that time? A. Yes. Q. Was it the same paper or another paper? A. Yes, it was the same paper; it was in a sealed envelope. Q. Was it open at the time she spoke to you about it? A. When she signed it she asked me to open it and I unsealed it standing by her. She said, ' Take it out.' Q. That was the second time she spoke to you about the paper? A. Yes, sir. Q. That was the time you were there with the other witness? A. Yes, sir. Q. She took it out of the envelope? A. She asked me to take it out. * * * By the surrogate: Q. Did she read the paper again when she opened the envelope? A. Yes, sir. Q. What language did she use when she spoke to you and asked about signing the paper, so far as you can remember, the exact language? A. She said she wanted us to sign it because she wanted it done right. I said to her to sign it again, because she had already signed it, and she signed it again, and then we signed and she thanked us for signing and said that she was glad it was signed, and she thanked me for some flowers I had sent her. She said at that time or at some other time a great deal about being neglected because none of her friends came to see her."

Bess L. Stevens, the other subscribing witness, testified in part as follows: " Q. I will ask you, referring to proponent's Exhibit 1, if that is your signature. A. Yes, it is. Q. And again referring to proponent's Exhibit 1, did Mrs. McGrath sign this signature in your presence? A. Yes, she did, this one here. Q. And did Miss Pendleton sign it in your presence? A. Yes, sir. Q. And at the

time that the document was signed by Mrs. McGrath and Miss Pendleton and yourself, in your presence, just what did Mrs. McGrath say, and what was said at the time of the execution of proponent's Exhibit 1? A. Miss Pendleton said to Mrs. McGrath, you remember having met Miss Stevens, and she said yes, she did. She said, ' Miss Stevens is here to witness your signature,' and Mrs. McGrath, I do not believe addressed any further conversation to me. She just talked as she was signing it, talked to Miss Pendleton. ' I am so glad you came, I have been wanting to see you and I have sent for you and I have wondered why you did not come,' and Miss Pendleton said, ' Well, I am here now.' Q. What did she she say about the document, proponent's Exhibit No. 1? A. When I came in she had it in her hand and she was ready to sign it, and she said that she wanted to add that to her will, that she wanted Miss Ravelly to have the $2000. Q. Did she request you to sign this document, proponent's Exhibit 1, as a witness? A. Yes, she did. Q. And she signed first? A. Mrs. McGrath signed first. Q. And then Miss Pendleton signed? A. Yes. Q. And then you signed it? A. Yes, sir. Q. And were you all together? A. Yes, sir. Q. Was Mrs. McGrath under any restraint of any kind? A. Not that I noticed. Q. From her conversation can you say whether she was rational or irrational? A. She seemed to be rational. Q. Was there anything about the situation there that would indicate otherwise than that she was rational? A. No. By the surrogate: Q. In your opinion was she of sound mind at the time? A. Yes, sir. Q. And was she under any duress of any kind? A. No, sir, I would not say so. Q. Influenced by anybody so far as you could say? A. No, I would not think so," and later in her examination she testified as follows: " Q. Considering the conversation that she had and her actions, and the conditions which you have described at that time, what impression did it make upon you, rational or irrational? A. I thought she knew what she was doing all right. * * * Q. All of these events that have been described occurred in the Hotel Judson on Washington Square? A. Yes, sir. Q. Mrs. McGrath had a room there? A. Yes. Q. And Miss Pendleton, the other subscribing witness, also had a room in the Hotel there? A. Yes, sir. By the surrogate: Q. Have you any friend that is interested in this will at all? Q. No, sir. Q. You are not a beneficiary under the will or codicil? A. No, sir. Q. You have no connection with the will? A. No, sir. Q. Or with the codicil? A. No, sir."

From the above it appears that the first interview with testatrix and Miss Pendleton concerning the paper was on Thursday, November 7, 1929, and the second interview and the execution of the

paper as a will was on Saturday, November 9, 1929.    After the incident on the latter date, as described above, the paper in question reads as follows:

" The Penna Co. Nov. 6th, 1929.    Please give to Miss Ravelly at my death two thousand dollars as a present from me for devotion in my last few hours.                              " A. R. McGRATH.

" My grand father clock I giv to Virginia Pfeil.
" VENITA PENDLETON.
" BESS L. STEVENS.
" Nov. 9, 1929."

Upon the testimony of the subscribing witnesses proponent rested.    Contestant thereupon called as witnesses Dr. Charles P. Elwert, testatrix's physician; Elsie Anderson, her nurse; Bertha M. Porchey, who had nursed her; Anna D. Cadmus, who had known her for twenty years or more; Mary Newton, who had known her ten years; Virginia Bartle Pfeil, who had known her ten years; her husband, Mr. Pfeil.    Miss Anderson described the condition of decedent from November sixth, when she first took up the case, till her death on November thirteenth.    She was present, she said, on November ninth at the time when the subscribing witnesses were in the room.    In certain essential particulars, she confirmed the testimony of the subscribing witnesses.    The other nurse, Miss Porchey, attended her from November fourth for the period of two nights and a day and next attended her on November ninth, but after the execution of the paper.    She described the actions of the patient during the periods in which she nursed her.    Miss Cadmus saw her on November fifth for three or four minutes and she looked in on her on another day.    The impression on her was that of irrationality.    Miss Newton saw decedent November fourth at which time she took no part in the conversation going on in the room; saw her on the fifth of November when, she said, she was throwing her arms around very wildly, witness remaining there three or four minutes.

Miss Newton on the sixth of November went to her door and looked in on her and saw her lying quietly; saw her on the seventh throwing her arms around and trying to throw the bed clothes off the bed; testatrix did not recognize her, did not speak to her, put her hands up to her head.    On November eighth the door was open but witness did not go in.    On Saturday, November ninth, witness testified to visiting her, and stated that she made some sounds which were not words.    Witness said to her, " Do you recognize me, Mary Newton? " and " there was just waving of the hands, that is all."    Miss Newton answered " irrational " when

asked the customary question as to impressions. Mrs. Pfeil saw
testatrix twice during her last illness. She visited her on November
ninth. She testified to her slowness in recognizing Mr. Pfeil,
witness' husband, of an articulate moan once or twice and her words
" My dear children." She described her visit on November fifth.
She said testatrix seemed to be in pain, she remained ten minutes.
When asked the usual question as to the impressions made upon
her by the acts and conversations described in her testimony, she
answered, " Not as rational." Her husband, Mr. Pfeil, who
accompanied his wife on one of these visits, testified briefly and
when asked the question as to impressions made upon him,
answered, " I would say she was irrational." Dr. Charles P.
Elwert testified as follows in the direct: " Q. How long have you
been a practicing physician? A. Forty years. Q. State briefly
what your experience has been. A. I am registered on the Sanity
Board to examine cases in the State of New York, twenty years ago.
Q. And during that period of twenty years have you had to do
with a number of insane cases? A. I have. Q. And you attended,
did you not, the decedent, Anna Richards McGrath, as her
physician? A. I did. Q. When did she die? A. November,
1929, the 13th. Q. Of what did she die? A. Senile dementia.
Q. How old was she? A. She was either eighty-six or eighty-eight.
She told me once eighty-six and then again she told me eighty-
eight. Q. She was residing at the Hotel Judson at the time of her
death. A. She was. Q. And she had been there for some years?
A. Yes. Q. How long had you known Mrs. McGrath? A. She
had been a patient of mine for over twenty odd years. Q. And
had you known her both as a physician and as a friend? A. I did.
In fact, I went away on summer vacations with her during four
summers. Q. Was the decedent with you last summer part of the
time. A. She was, at Richfield, above Sebago Lake. Q. When did
you first observe symptoms of the senile dementia. A. I first
observed the senile mania along about the 5th of November. Then
it gradually developed into senile dementia. Q. You say that
Mrs. McGrath was with you in Maine during the last summer
part of the time? A. Yes, sir. Q. Did you notice any symptoms
at that time? A. I did. That was where I first noticed the
symptoms. Q. Please begin at that time and describe the
symptoms which you observed. A. Sitting on the porch at night
she would say, ' See the cavalier, see him coming along the road,
he is drawing his sword. Now he is going to stab the woman that
is with him,' and I looked down and said I did not see any cavalier,
and she said, ' Oh, yes, now he is killing her.' I said, ' There is no
cavalier.' After a short time she said, ' Did you see the old man

and the old lady, the old man with whiskers? Now they are coming and I am going in the house.' She referred to Mr. and Mrs. Cole. Mr. Cole had picked up his father and mother and carried them down in the cellar and laid them on a board for two weeks so that they could get out of the snow, and they repeated that to Mrs. McGrath, and she had had it in mind. She said, ' They will come back, they are not dead.' Q. Did you see her do anything unusual in her room about the articles in the room? A. She would take a lamp on one or two occasions and set it on the floor instead of on the table, and I had to get it and put it on the table, because I was afraid she would tumble it over and set the place on fire. I lit her lamp and two nights I was not there to light it, and when I went there to see the lamp was sitting on the floor instead of being placed on the table. Q. Did you observe whether she did any reading? A. She did some reading, but she seemed to have the same book all the time. Q. What was the book? A. A French book. Q. Did you accompany the decedent to New York from Maine? A. I did on the steamer. Q. Did anything occur on the steamer bearing upon her mental condition? A. We were sitting on the deck and she took my arm and pressed it. She said, ' Do you hear the voices from underneath the sea? ' She said, ' Hear them singing? ' and I said I didn't hear anybody singing, ' That is the radio,' and she said ' No, that is no radio, they are singing from underneath the sea to God,' and I said, ' That is nice,' and she said, ' No, I don't believe in God, and I don't believe in the damned Bible.' Q. Where was it that you first attended Mrs. McGrath in the Hotel Judson at the time of her last illness? A. She was taken ill on the 15th of October with influenza, and I treated her from the 15th. Then she improved until she went out with some lady on the 26th to a movie, against my wishes. She was taken with a relapse on the 27th, and after that this senile mania started, and I noticed it on the 5th quite pronounced, and it increased as it went into senile dementia on the finish-up of her life. By the surrogate: Q. What is senile mania? A. Softening of the brain, where for instance they throw their hands' about and say, ' Let me die,' and when they are trying to get out of bed. Q. You have defined it simply as softening of the brain? A. Yes, due to old age. By Mr. McGrath: Q. Passing to the week of November 6th, I believe that was Wednesday, but passing to that week, will you describe the condition of the patient during that week? A. On the night of the 5th she was in a pretty nervous condition, highly mania. Then I first posted a notice on the door, on account of her condition, that I did not want her disturbed, positively no friends or visitors admitted, with my name. Q. Had you previously had any talk

with Miss Pendleton about her going into the room? A. On making my visit on the 4th in the morning I met a lady there, and the piano was being moved. Mrs. McGrath was lying in the middle of the room and I mentioned she had better have the piano moved so that she could get more air in the room. I said, ' What are you going to do with the piano,' and she said, ' I am having it moved,' and I said, ' Why don't you sell it? ' and she said, ' I am going to sing,' and I said, ' I never heard you sing,' and she said, ' I can sing and I am going to sing.' Just as I was through, the French lady, Miss Ravelly * * * Q. Did you see the patient on November 6th, 7th, and the 8th and 9th of November? A. I did. Q. You went there every day? A. I went there every day, sometimes twice a day. Q. What was her condition from the 5th of November? A. From the 5th of November, she was in rather a senile mania condition, rather nervous, in that condition, and I had to place her on bromides and codein. Q. Was she able to sleep without those medicines? A. She was not. Q. And from the 5th of November until her death did you prescribe those medicines? A. I did, and then I had it changed to belladonnin tablets. That is barbital-atropin combined, which we use in maniac cases. Q. Describe the condition of the patient from the 5th, mentioning anything that bore upon her mental condition that you recall up to the time of her death. A. She was in a decidedly nervous condition, highly agitated during the 6th. She exhausted the nurse and I had to send for Miss Porchey. On the 7th. By the surrogate: Q. You say that she exhausted the nurse? A. Yes. Q. You mean physically? A. Yes, sir, holding her in bed. Q. A woman of eighty-eight years of age? A. Yes, sir, she was tossing about and slipping out of bed. Q. Why did you not have her taken to a hospital? A. Because she made me promise not to take her to a hospital. Q. You thought enough of her decision in the matter to abide by it? A. Yes, she asked me on the first part of her illness. By Mr. McGrath: Q. Continue to state anything that you noticed of her behavior? A. On the 7th I had to tie her legs and arms to keep her in bed. That was in the morning. I was obliged to do that. Q. From the 5th was her condition progressively worse until the time of her death? A. She daily progressed worse. Her condition was in poor circumstances. Q. Having regard to the illness from which she was suffering, in your opinion was she able to understand any business matter? A. Positively not. Q. Was she rational or irrational? A. She was irrational. Q. Does that testimony apply to the entire period from November 6th to the time of her death? A. Yes. That applies to the time I was there, morning and night, during my visits. Q. Was the effect of the

medicines which you gave her, to quiet her?  A. Yes.  Q. That was the very reason you gave them to her, to stop this restless rolling.  A. Yes, sir.  Q. Do you know that on one occasion she rolled out of her bed?  A. She did, yes.  By Mr. Link:  Q. She had a keen sense of humor, hadn't she?  A. I do not know what you mean by that?  If you will explain it I will answer it.  Q. She was fond of making jokes?  A. What time?  Q. During the twenty-year period before she developed this senile trouble?  A. Yes, she was pleasant.  Q. She liked to make a joke, didn't she?  A. I do not know what you mean by 'liked to make a joke.'  Q. That is common English.  A. She would listen to a joke, but I don't remember her telling a joke herself.  Q. Did she like to play a joke on people?  A. Not that I know of.  I never saw it.  Q. And when she said that she was going to sing, was she joking with you?  A. I didn't think so.  I do not think she knew what she was doing.  Q. Don't you know that she was joking?  A. I don't think she was joking.  Q. Have you your office records with you?  A. No, I have not.  By the surrogate:  Q. Did you expect to be catechised about this?  A. I have never before.  Q. You knew you would be here and subjected to cross-examination?  A. Yes.  Q. Have you an office record that gives a record of every visit there?  A. I think I have.  Q. Have you a list of the prescriptions that you gave her?  A. Not with me.  Q. Take a look at this paper and read it over and tell me if you think it denotes any irrationality.  A. It is a nervous hand.  Q. You would expect that with a woman of eighty-eight?  A. Yes, but she wrote a very good hand.  Q. Read it, and tell me as an examiner in lunacy if that denotes — leaving out of your mind everything that you know about the woman, if that denotes any irrationality.  A. The way that I can answer that is to have her write just before she got sick.  Q. Just a difference in chirography?  A. Yes.  Q. Read it.  A. I cannot read it all. ' Please give to Miss Ravelly after my '— something — ' $2,000 '— something — I do not know what that is, and I do not know what this is.  Q. You do not make out a couple of words?  A. No, sir. Q. If you forget all that you know about this woman, I would ask you if the person who wrote that paper — would you say that that person was maniacal?  A. I was not there when she wrote that. Q. Would you say that the person was irrational who said, ' Please give a present of $2,000 ' to a woman who had been around her for some time, and teaching her and attending to her?  A. Unless she was told to write that.  She might have been told. Q. Assuming that she was not told, would you consider that anything irrational?  A. Not if she was not told.  Q. You would not stake your reputation on the statement that this was irrational? A. I could not, no.  Q. Have you ever seen people who were

octagenarians write? Ordinarily you find the hand shaky? A. Usually. By Mr. Link: Q. Especially if she wrote that propped up in bed? A. I don't know where she wrote it. I was not there. By the surrogate: Q. You say that she was suffering from mania, from October 27th, and then she began to develop a senile mania? A. Yes. Q. I will ask you again — you found her in this wild excitement, you found her again when she exhausted her nurse? A. Yes. Q. Why did you not take her to a place where she would be safe? A. She had always asked me not to take her to a hospital. Q. Because she told you not to take her to the hospital? A. Yes. Q. And that is the only reason? A. Yes. Q. Was there any fire escapes near this woman's room? A. Yes. Q. Do you know whether it was a fire escape adjacent to this apartment? A. I think there is one in front. Q. Do you know it? A. I am not positive. Q. Is it a fireproof building? A. That I could not say. Q. What floor was she on? A. On the second floor. Q. And you left her there with the nurse during these times when you say that she evidenced senile mania, and later senile dementia? A. Yes. She had two nurses later on. By Mr. Link: Q. When did you put the second nurse on the case? A. I had Mrs. Porchey, if I remember, she worked there the 4th and the 5th, with reasonable certainty. Q. Was that during the daytime or the night time? A. She was there during the night time. Q. And who was there during the daytime? A. Miss Pendleton. Q. And before November 4th you only had one nurse, is that right? A. Yes, one nurse. Q. Prior to November 4th you had one nurse? A. Yes. Q. What hours did that nurse spend there? A. Twenty-four hours. She had six hours for rest. Q. But she slept in the place? A. Yes, she was off six hours. Q. She went away for six hours? A. Yes. Q. Who was there during that time? A. Mrs. Cady and Miss Ravelly relieved her during those hours in the afternoon. Q. In spite of this hysterical, insane condition, where she was tossing around and doing all those things, that you say, it was sufficient for you to have one nurse working eighteen hours on the case, and then to be relieved by two women who were not nurses and one a very lame woman and a physically incapable woman, is that right? A. But only for a few days. Afterwards we had two nurses. Q. You will concede that while Miss Revelly was there she was physically unable to do anything? A. After that she was not so violent. Anybody could assist to relieve the nurse in the daytime. Usually this comes on more violently in the night time. By the surrogate: Q. How much did she weigh? A. About 130 pounds. Q. Did you weigh her during November or October? A. I weighed her in Portland, Maine, before taking the steamer. Q. But not after that? A. No.

Q. You found her indicating irrationality when you were down in Maine and she sat on the porch? A. Yes. Q. And you made no plans to put her in a sanitarium where she might be watched? A. No, but only then at times she had delusions, at that time. Q. She saw a light coming through the woodlands in the distance down the road, and she said, 'There comes the cavalier?' A. Yes. Q. That was a delusion? A. That was more than a delusion. Q. You thought that she acted queerly on the boat when she referred to singing sounds that she heard? A. Yes. Q. And she was looking on the ocean. You said, 'That is the radio?' A. Yes. Q. You thought that she was irrational after that conversation? A. Yes, sir. Q. What did you do to restrain her, what precautions did you take to prevent her from doing violence or jumping? A. She did not get started with the mania until after the 5th of November. Q. Just before the date of the codicil? A. As I remember, that is when she had the starting of the mania. Q. Tell any conversations outside of the fifth or sixth that you had with her. A. *All she said was, 'I do not want to die, don't let me die, whatever you do.'* Q. Did you have any other conversation with her but that? A. No, sir. Q. And the conversation with you when you ordered the piano away, she said, 'Don't take it away, I want to sing?' A. That was on the 4th. Q. What other conversations do you remember? A. *After that, very little conversation. Q. How do you predicate irrationality on those two remarks? A. The muttering and the condition of her hands and, 'I do not want to die, don't leave me.' Part of the time I do not think she knew I was there. Q. How old are you, Doctor? A. Sixty-eight. Q. You have been practicing medicine for over forty years? A. About forty. Q. Have you ever had a patient as old as she? A. Yes. Q. You would expect them to show the marks of age at that time, wouldn't you? A. Possibly."*

Paul Carpenter, an attorney of Chicago, a friend of deceased for many years, was presented by the proponents. He was the strongest, most definite and most impressive witness in the whole trial. He saw and talked with decedent in May, June, September and October, as well as on the first two days in November. He also saw her on November fourth, the day on which the piano was moved and on one day thereafter, the exact date of which he could not recall. He described the conversations with decedent. They spoke on religious subjects, on politics, on hotel service in France and Belgium (witness had returned from Europe in September). She discussed these various subjects, she said she was obligated to him for coming to visit her. She was, he said, quite sprightly and jocular and apologetic about the service in her hotel. He testified

that she wanted to be in the front room so that she could be comfortable and he had the furniture moved. This was on the day of the removal of the piano referred to by Dr. Elwert. He declared when asked what impressions all these acts and conversations made upon him, etc., " Entirely rational." His testimony as to the time covered by it, September, October, November, up to and beyond November fourth, flatly contradicted the testimony of Dr. Elwert. Moreover, the latter's attempt to classify the decedent as beginning to be irrational in August up in Maine is negatived completely by the following letter offered in evidence which was written from the country in August by decedent:

" SEBAGO LAKE, MAINE.
" *Aug. 9th* /29.

" You must forgive me for not writing dear child, but I knew you were happy and receiving so many letters, from the other side, mine would not be missed. Has our dear boy got back yet — for your sake I hope he has, and everything is turning out as you wish, and that I may soon be called on to hold up the brides train, with one hand, while with the other I scatter flowers before her, and this will require some dexterity and we can practice it in private with paper flowers.

" I am wondering how your trip with your patient and her father turned out, and if the mother has been shut up in an institution in consequence.

" I came here two weeks ago after our Canadian trip. My sister in law returned to New York after dropping me in Portland. Its only an hour on the train from there. She is now in North Carolina with her sister. We managed to escape a good deal of the hot weather — but since I came here I have found it uncommonly cold, so that I am wearing in the evening my heavy winter coat.

" My Doctor and his wife are here. He was a very sick man when he came and his wife could hardly induce him to stay — he wanted everything, but today he seems quite content — has recovered his health and is looking well and I believe has forgotten he is a Doctor.

" I will return with them to New York on Aug. 16th by boat — arriving Saturday evening about 5 O'C. I am growing impatient to get back to my comfortable quarters. The lack of a bath room and electric light are very trying — but the home cooking after living all winter on Hotel food is very agreeable, and I have a lovely big room with six windows on the ground floor — sometimes I feel rather nervous about it, as everything is left wide open. I must stop now, it is growing late.

" With love, always
" A. R. McGRATH."

I hold (1) that the requirements of the statute as to execution were complied with by testatrix. The subscribing witnesses are credible witnesses and have no interest in the decedent's estate. Their testimony in the main was confirmed by contestants' witness Anderson; (2) that there is not a scintilla of proof of fraud or undue influence; and (3) that the proponent has sustained successfully the burden of proof as to the testamentary capacity of testatrix. My conviction in this regard is based upon all the proofs but particularly upon (1) the instrument itself which is holographic, which originated with testatrix, which bears throughout the marks of a sane and thoughtful author, which in tenor and purpose conforms with the testamentary scheme of the will of testatrix (in which she bequeathed $500 to Miss Ravelly and the residuary estate to the "Indigent Widows' and Single Women's Society of Philadelphia"); (2) upon the testimony of the subscribing witnesses and of the nurse, Elsie Anderson, and (3) upon the testimony of Paul Carpenter. Moreover I find the letter of testatrix written in August a complete answer and contradiction to Dr. Elwert's testimony as to the mental capacity of testatrix in August. I find his testimony as to the condition of testatrix in November, 1929, not reliable or dependable in the face of all the proofs, and the testimony of the other witnesses called by contestant (excepting the nurses) not convincing or compelling for the reason that their visits were altogether too brief and the opportunity for observation too meagre to afford any great weight to their impressions as to rationality. The testimony of Nurse Anderson confirms much of the testimony of the subscribing witnesses and taken as a whole is not inconsistent with the finding of testamentary capacity. I attach little importance or weight to the testimony of the other nurse, Porchey. The propounded paper will be admitted to probate with exceptions to contestants.

Submit decree.